## CLARK v. SMALLWOOD et al.

(Circuit Court, W. D. New York. September 9, 1907.)

No. 128.

1. MORTGAGES—TRANSFER OF PROPERTY—MORTGAGOR AS SURETY—RIGHT TO COMPEL FORECLOSURE.

An assignee of notes and a mortgage security, who has knowledge of an arrangement between the mortgagor and mortgagee by which a new agreement is substituted for the old, and the mortgagee becomes the owner of the mortgaged property, and, by assuming payment of the mortgage debt, becomes the principal debtor and the mortgagor his surety, is bound to take notice of such changed conditions and to foreclose the mortgage when notice is given by the mortgagor requiring it, under penalty of releasing the latter from liability.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 35, Mortgages, § 756.]

2. PRINCIPAL AND SURETY—DISCHARGE OF SURETY—FAILURE TO PROCEED AGAINST PRINCIPAL—WAIVER.

A surety for a debt secured by mortgage who has demanded of the creditor that he foreclose the mortgage loses his right to insist that the failure to comply with such demand until the mortgaged property has become worthless releases him from liability, where, with full knowledge of such failure, he continues for years to join in the renewal of the notes.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 40, Principal and Surety, §§ 366-372.]

3. MORTGAGES—CONVEYANCE OF PREMISES—ASSUMPTION OF DEBT BY GRANTEE—DISCHARGE OF MORTGAGOR—SUIT TO CANCEL DEBT—DEFENSES.

Complainant bought an interest in certain oil leases in Pennsylvania, and gave his notes for the purchase money secured by a mortgage on the property. These notes and mortgage were transferred by the mortgagee to defendant bank. Subsequently complainant reconveyed the property, and the mortgagee assumed payment of the notes. Complainant afterward demanded that defendant foreclose the mortgage, but it was not done, and the notes were renewed from time to time until both defendant and the mortgagee became insolvent, and the mortgaged property which had been transferred to others had become worthless. Under the statute of Pennsylvania, a mortgage on a leasehold interest is not valid unless the lease, as well as the mortgage, shall be recorded, and the leases in question were not so recorded. *Held,* that the invalidity of the mortgage constituted a defense to a suit by complainant for the cancellation of the notes because of defendant's failure to foreclose.

4. ESTOPPEL—EQUITABLE ESTOPPEL—SILENCE RESPECTING MATTER OF RECORD.

The fact that defendant, with knowledge of the invalidity of the mortgage, induced complainant to enter into another contract and assume a further liability in the belief that the mortgage security was good and would be enforced, did not estop defendant from pleading the invalidity of the mortgage, where no actual fraud was practiced nor misrepresentation made; the means of ascertaining the validity of the mortgage being open to complainant, as well as to defendant.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Estoppel, §§ 285-287.]

5. BANKS AND BANKING—ADVANCES BY BANK—IMPLIED AGREEMENT FOR IN-
TEREST.

    The right of a bank to interest on advances made is to be implied, unless the parties to the transaction have otherwise stipulated, or under the circumstances it would be inequitable to exact it, and such right is not lost merely by a failure or refusal to furnish statements of account to the debtor when requested.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Banks and Banking, §§ 686–700.]

In Equity. On final hearing.

Stearns & Thrasher (George E. Towne and Arthur C. Wade, of counsel), for complainant.

Rogers, Locke & Babcock (Louis L. Babcock, of counsel), for defendants.

HAZEL, District Judge. In this action the orator asks for an accounting between himself and the defendants, and specially that certain promissory notes made by him and discounted by the Fredonia National Bank, but now owned by the defendant Smallwood, be decreed and adjudged to be fully paid. The material facts are as follows: On December 30, 1889, the orator bought from Mr. Waterhouse an undivided one-third interest in certain oil lands situated in the state of Pennsylvania, known as the "Neiltown property," for the sum of $14,000, and to secure the payment thereof he gave notes and a mortgage upon the property. The mortgagee assigned the mortgage to the Fredonia National Bank as collateral security for the payment of the notes, which the bank discounted. Subsequently on May 10, 1890, the plaintiff, having become dissatisfied with his purchase and with the knowledge of the bank, reconveyed the property to his grantor, who, in consideration thereof, assumed the payment of all the notes which had theretofore been indorsed by him and discounted, as already stated. As the notes from time to time became payable, they were either renewed by the plaintiff and Waterhouse or paid by the latter under the agreement of reconveyance, and the original debt was reduced by Waterhouse from $14,000 to the sum of $7,200. In the spring of 1892 Waterhouse became insolvent, and discontinued paying the maturing notes, which, however, were thereafter repeatedly renewed, and payment thereof extended by the orator until the Fredonia National Bank suspended payment in June, 1905. Prior thereto, in the month of April, 1895, one Tarbox, to secure a debt of $1,200 to said bank, transferred to it as collateral security certain oil lands known as the "Tiona Property," and later, with the consent of the bank, he transferred the title of such property to the orator, who thereupon entered into an agreement with the bank by which the latter was to control and operate such oil properties, and to advance the amount necessary to put the oil wells on the Tiona property from flowing to pumping, and, after the expenses were paid, the proceeds of sales of oil were to be applied upon the mortgage liens and the promissory notes in question. Upon the trial the court allowed an amendment to the bill, which substantially charges that the orator was induced by the bank to take title to the Tiona

oil lands and assume the Tarbox indebtedness of $1,200 to the bank, and also to allow the deed of such property to run to the bank as collateral for the Waterhouse notes upon the contemporaneous oral agreement of the bank "at the first opportunity when the same could be done" to foreclose the mortgage in question, which, as already stated, had theretofore been reconveyed to Waterhouse. Evidence was introduced by the orator tending to prove that prior to the above-mentioned reconveyance and thereafter, in 1895, the oil wells upon the property flowed, the property was valuable, and the mortgage interest was regarded by the parties herein concerned as ample security for the original debt. At present the property in question concededly has no substantial value.

Accordingly the contention is that, if the bank had seasonably foreclosed the property as agreed, and when requested so to do, the proceeds of the sale would have been more than sufficient to wipe out the debt arising from the Waterhouse transaction. The defendants have given evidence denying the agreement to foreclose the mortgage, and have introduced testimony indicating that the mortgage in fact at the time of its execution was defective, the recording act of Pennsylvania not having been complied with, and no valid lien was acquired in respect to certain leaseholds described in the mortgage.

For the purpose of discussing the equities, it will be assumed that the proofs disclose an agreement to foreclose the mortgage and a sufficient notice by the orator to the bank to institute foreclosure proceedings, and apply the proceeds of the sale to the payment of the notes. We come to inquire, then: What were the equities of this case, and upon what principle must they rest? By the transfer of the property to Waterhouse, and his agreement to pay the notes made by Clark, the latter in my judgment became in equity the surety on the notes, and Waterhouse by the changed conditions and his said agreement to pay the notes at maturity became the principal debtor to the bank. The assignment of the mortgage to the bank was collateral, and without doubt foreclosure proceedings could have been instituted by the bank on the notes becoming due and unpaid. I think that the holder of a mortgage security, knowing of an arrangement between the mortgagor and mortgagee, by which a new agreement is substituted for the old, and by which there is a substitution of liabilities, is bound to take notice of such changed conditions, and is obliged to foreclose the mortgage when notice is given requiring diligent pursuit of the principal debtor (Hunt v. Prudy, 82 N. Y. 488, 37 Am. Rep. 587; Colgrove v. Tallman, 67 N. Y. 95, 23 Am. Rep. 90), although it is questionable whether an indorser of a note, in the absence of special equities, can compel the holder to enforce his security (First National Bank v. Wood, 71 N. Y. 405, 27 Am. Rep. 66). In Newcomb v. Hale, 90 N. Y. 326, 43 Am. Rep. 173, the doctrine was recognized that, upon refusing or neglecting to comply with the notice of a surety to proceed against the primary debtor when the debt was collectible, it afterwards becoming uncollectible, the surety must be exonerated from liability. Foreclosure could have been instituted by the bank after the reconveyance of the property to Waterhouse without making Clark a party, who, under the arrangement,

stood in the place of the original mortgagee, and equitably, became secondarily liable on the notes made by him. Had the bank foreclosed the mortgage debt, it would have been trustee for Clark for the payment to him of any remainder after satisfying the debt on the notes. The evidence on behalf of the orator points out that verbal requests to foreclose the mortgage were frequently made from 1895 to 1905, when the bank closed its doors, the orator waited and delayed in the complete consciousness that his requests were persistently ignored, and that the bank neglected to proceed. Indeed, during this time the notes were repeatedly renewed by him and payment extended, reliance evidently being placed upon their final payment or adjustment from the proceeds of the Tiona oil properties. It was only from the date of the suspension of the bank that the orator asserted any equitable rights resulting from the altered situation. If he believed that the bank would not promptly act upon his request to foreclose the collateral security, his remedy was to pay the debt and obtain subrogation to the mortgage, or sue in equity to be relieved from his liability on the notes on account of the laches of the bank.

The principle enunciated in Norton v. Warner, 3 Edw. Ch. (N. Y.) 112, is not entirely inapplicable to the facts in controversy. There a mortgagee who had pledged the mortgage for a loan of a less amount than the mortgage was permitted to institute foreclosure proceedings where the pledgee refused to do so, and in McLean v. Towle, 3 Sandf. Ch. (N. Y.) 117, it was held that a surety who pays a mortgage given to secure a debt becomes subrogated in equity to the rights of the creditor, and may foreclose the mortgage in his own name. It may be suggested that it would have been an anomaly for Clark to foreclose a mortgage executed by himself, but the bill could have set forth the facts and circumstances so as to enable a court of equity to decree such relief as the nature of the case warranted. It must therefore be held in this case that the creditor acquiesced in the delay to foreclose the mortgage and he cannot now be held to assert an equitable remedy resulting from the claimed delay of the bank. It is, however, contended that the bank in the year 1892, without the orator's knowledge or consent, transferred or assigned the mortgage to the Tidal Oil Company, or discharged the same in consideration of the assumption or payment by such company of the Cogley debt to the bank amounting to a large sum of money. That there was a discussion in relation to the mortgage on the Neiltown property as an obstacle to the proposed sale is not disputed, but that it culminated in an assignment or discharge of the mortgage is not thought proven. The presumption may be indulged in, I think, that the sale of oil lands to the Tidal Oil Company was consummated irrespective of an assignment or discharge of the mortgage, and probably with the knowledge and assurance of its invalidity as a lien upon the leasehold. It is true that the witness Lown, referring to the sale of the Neiltown property, testified that it was agreed by the bank that the mortgage in question should be canceled and discharged, and that, in fact, it was either assigned or a written satisfaction of the mortgage delivered to the Tidal Oil Company. This testimony, however, lacks probative force, and, in part at least, is shown to be in error, as the mortgage, which had been mislaid,

was produced upon the trial; it having been found among the papers and documents of counsel consulted by the bank regarding its validity. I am satisfied by the evidence in its entirety that the claim that the bank actually profited by a discharge or cancellation of the Clark mortgage, or that by an agreement to procure a discharge thereof it was enabled to wipe out the Cogley debt (assuming that a mortgage given as collateral security can legally be segregated from the debt which it is designed to secure), is not supported by the proofs.

The evidence in relation to the validity of the mortgage as a lien upon the leaseholds described in the same is thought to have an important bearing upon this point. An inspection of the mortgage indicates that all the land therein described, about 700 acres, with the exception of 28 acres owned in fee, consisted of leasehold interests. The acts of 1885, 1868, and 1876, laws of the state of Pennsylvania, provide that leasehold property may be mortgaged as in the case of mortgaging of a freehold interest, provided the mortgage, together with the lease, be acknowledged and placed of record in the proper county. The decisions of the Supreme Court of the state of Pennsylvania construing such statutes have uniformly held that, where the mortgage covers leaseholds which were not recorded with the mortgage as required by the above-mentioned acts, and, where there was no substantial compliance with such requirements, the mortgagee acquired no valid and subsisting lien. Hilton's Appeal, 116 Pa. 351, 9 Atl. 342; Sturtevant's Appeal, 34 Pa. 149; Ladley v. Creighton, 70 Pa. 490; Gill v. Weston, 110 Pa. 305– 312, 1 Atl. 917. What the equities would have been had other rights and interests not intervened need not be discussed or passed upon as the title to the property in question is shown to have passed to other parties. It is insisted that the defendants are precluded from asserting the invalidity of the mortgage on the leasehold, on the ground that the orator believed it to be a valid lien, and was induced by the bank, which had knowledge of the claimed invalidity of the mortgage, to enter into the Tarbox agreement upon the promise to begin foreclosure proceedings. The doctrine of equitable estoppel, however, is not thought to apply to the facts in controversy. Clark was the original mortgagor of the title which he took from Waterhouse, and manifestly had the same means of ascertaining the same facts regarding the validity of the mortgage as had the bank. The principle enunciated in Brant v. Virginia Coal & Iron Company, 93 U. S. 326, 23 L. Ed. 927, where it was held that, if the conditions of the title are known to both parties or both have the same means of ascertaining the truth, there can be no estoppel, is thought to apply; and, as the requirements of the recording acts and circumstances of the claimed invalidity were equally open to Clark, the mere silence of Green, acting for the bank, is insufficient upon which to predicate an estoppel. Such is the rule in the absence of fraud (Driscoll v. Brooklyn Union Elevated Co., 42 Misc. Rep. 120, 85 N. Y. Supp. 1000), and I conceive that the evidence in this case falls short of establishing wrongful intent to mislead the plaintiff.

The next question presented is in regard to the interest chargeable by the bank upon the amount advanced to put the Tiona oil property from flowing to pumping. It was agreed that such advances should be repaid from the oil runs; no definite time of repayment being speci-

fied. Nothing was said by the parties regarding the payment of interest, and accordingly it is contended, first, that no agreement to pay interest can be implied; and, second, that, as frequent demands were made between the years 1895 and 1905 for a statement from the bank of the oil runs and credits, no interest is recoverable. That the bank is entitled to interest on such loans and advances, even though the agreement does not expressly so provide, is beyond serious question. I deem it to be the law that the right to interest is to be implied where there is no express promise, unless the parties to the transaction have otherwise stipulated, or where it would be inequitable to exact it. Gillet v. Van Rensselaer, 15 N. Y. 397; Rodgers v. Clement, 162 N. Y. 422, 56 N. E. 901, 76 Am. St. Rep. 342; C. C. Woerz v. Schumacher, 161 N. Y. 537, 56 N. E. 72; Spalding v. Mason, 161 U. S. 575, 16 Sup. Ct. 592, 40 L. Ed. 738. The point has force that as to the allowance of interest the parties must be governed by the uniform practice of charging interest by the bank. Such usage and custom, of course, was known to the complainant, and accordingly the charge of interest, though not in terms mentioned in the agreement, may nevertheless be deemed a part of it. Esterly v. Cole, 3 N. Y. 502. That the complainant personally and by counsel frequently demanded from the bank a statement of the account between them which for one specious reason or another was refused by its cashier standing alone is not sufficient to justify a decree that the bank is not entitled to the usual increment from loans and advances made by it. The amount advanced was largely, if not altogether, for the benefit of the complainant, as appears from the Tarbox agreement, and the sums realized from pumping and sale of oil were to be applied to the reduction of his debt after payment of expenses and a claim to the Warren Savings Bank.

All the questions submitted bearing upon the equities of the parties having been passed upon, nothing remains for consideration, except the amount for which judgment in accordance with this decision should be entered. In the briefs submitted by defendants, it is claimed that in the summary of the entire indebtedness as set forth in the complainant's brief a number of proper charges in relation to which evidence has been given have been ignored, and that other charges and items have been inserted in the summary that should have been eliminated. When the case was submitted for decision, it was understood that, unless the statement of account showing the balance due from Clark to the bank was practically agreed upon by the parties, I should feel obliged on account of press of other cases to refer the subject-matter of stating the account of other items of notes and advances made by the bank to Clark to a master.

In view, therefore, of such failure to practically agree upon the amount due the bank upon other notes and transactions, I deem it proper that an order be entered appointing the clerk of this court to state the account, make computations between the parties, including the amount of the notes and interest in controversy, and report his conclusions to this court with all convenient speed, or, if the parties are able to stipulate such amounts and interest, their findings may at once be submitted in accordance with this decision. So ordered.